IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  06-30002 |
| | ) | |
| GERALD LIPPOLD, et al., | ) | |
| | ) | |
| Defendants. | ) | |

<u>**OPINION**</u>

JEANNE E. SCOTT, U.S. District Judge:

This matter comes before the Court on Defendant Gerald Lippold's Amended Motion to Require Notice of 404(b) Evidence (d/e 25) and his First Motion In Limine (d/e 35).  The Government filed a Response to Defendant Lippold's Motion to Require Notice of 404(b) Evidence (d/e 28), indicating that it did not intend to introduce any 404(b) evidence at trial, and thus it had no objection to Defendant Lippold's Motion.  The Government, however, indicated that it intended to introduce the following evidence pursuant to the "intricately related" doctrine: fly ash waste from City, Water Light & Power (CWLP) "was buried at the Curry excavation site on North Dirksen Parkway both before and during the time period of

1

the indictment and as a result of actions taken by [D]efendant Lippold not all of such ash was removed as required by the Illinois Environmental Protection Agency." <u>Government's Response to Defendant Lippold's Motion to Require Notice of 404(b) Evidence</u>, at 1-2. Defendant Lippold has filed his First Motion In Limine objecting to the introduction of such evidence. Defendant Lippold's Motion to Require Notice of 404(b) Evidence is ALLOWED; however, for the reasons set forth below, Defendant Lippold's First Motion In Limine is DENIED.

BACKGROUND

Defendant Gerald Lippold and his co-Defendants in this case are charged with the criminal offense of violating the Clean Water Act (CWA). The Indictment (d/e 1) alleges that the Defendants knowingly discharged a pollutant into waters of the United States from a point source, without a national pollutant discharge elimination system (NPDES) permit, in violation of 33 U.S.C. §§ 1311(a) and 1319(c)(2)(A) and in violation of 18 U.S.C. § 2.[1]

---

[1] 33 U.S.C. §1311(a) provides in relevant part: "the discharge of any pollutant by any person shall be unlawful." 33 U.S.C. §1311(a). 33 U.S.C. §1319(c)(2)(A) states in relevant part: "Any person who -- **(A)** knowingly violates section 1311, 1312, 1316, 1317, 1318, 1321(b)(3), 1328, or 1345 of this title, or any permit condition or limitation implementing any of such sections in a permit issued under section 1342 of this title by the Administrator or by a State, or any requirement imposed in a

The Government alleges the following in the Indictment: Defendant Lippold was part owner of Lippold & Arnette, Inc. (Lippold & Arnett), a bulk hauling company that operated a bulk hauling facility (Curry facility) at 3600 North Dirksen Parkway, in Springfield, Sangamon County, Illinois. The Indictment alleges that an unnamed intermittent tributary of the Sangamon River (the Sangamon tributary) flowed through the Curry facility. Water in the Sangamon tributary flowed to the Sangamon River in Springfield, Sangamon County, Illinois.

Sometime in 1999, Defendant Curry Ready Mix & Builders' Supply, Inc. (Curry Ready Mix), a bulk hauling and ready-mix concrete business incorporated in the State of Delaware and authorized to do business in the State of Illinois, purchased the Curry facility from Lippold and his partner.[2] After this purchase, Lippold & Arnett became a subsidiary of Curry Ready Mix. Defendant Curry Ice & Coal of Springfield, Inc. (Curry Ice & Coal),

---

pretreatment program approved under section 1342(a)(3) or 1342(b)(8) of this title. . . ." 33 U.S.C. § 1319(c)(2)(A).  18 U.S.C. § 2 provides: "(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces, or procures its commission, is punishable as a principal.  (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."  18 U.S.C. § 2.

[2]The Court notes that the Indictment fails to identify the name of Defendant Lippold's partner.  The unknown individual is not a party to this case.

an Illinois Corporation, was also a subsidiary of Defendant Curry Ready Mix. According to the Indictment, "[f]rom [o]n or about 1999 to the present, the [D]efendant Curry Ready Mix directed, controlled and supervised the operations of [D]efendant Curry Ice & Coal and [D]efendant Lippold & Arnett, Inc. at the Curry facility." Indictment, ¶ 3.

The Indictment alleges that, as part of the purchase agreement, Defendant Lippold agreed to provide consulting services to Defendant Curry Ready Mix. The Indictment alleges that, from on or about 1999 to at least in or about the summer of 2003, Defendant Lippold accordingly sought to increase the Curry facility's business and in doing so exercised substantial authority over operations in the Curry facility.

According to the Indictment, in or about March and April 2001, Defendants Curry Ready Mix, Curry Ice & Coal, and Lippold & Arnette accepted approximately 35,000 tons of industrial waste, containing fly ash waste and bottom ash waste from coal combustion, from CWLP. The industrial waste was placed in the Curry facility, and Defendants Curry Ready Mix, Curry Ice & Coal and Lippold & Arnette used such waste to fill a large excavation at the Curry facility.

The Indictment alleges that, some time in early 2001, rain water began

4

accumulating in the excavation site where the fly ash waste had been buried, causing boron to leach out of the industrial waste into the rain water that had accumulated in the excavation. The Indictment further alleges that "[t]his caused the accumulated water to be contaminated with a level of boron that was approximately 13 times greater than the concentration that IEPA would allow for purposes of water quality. . . . By 2003, several million gallons of boron ash wastewater had accumulated in the large excavation at the Curry facility." Indictment, ¶ 11.

The Indictment alleges that, beginning in or about June 2001, Defendants Curry Ready Mix, Curry Ice & Coal, and Lippold & Arnett received notices from the Illinois Environmental Protection Agency (IEPA) indicating that the Defendants had violated Illinois law by improperly managing the industrial waste at the Curry facility. The Indictment alleges that, after negotiations and discussions with the IEPA, sometime in or about 2001, Defendants Curry Ready Mix, Curry Ice & Coal, and Lippold & Arnett subsequently agreed to properly remove and dispose of the industrial waste buried in the excavation site, and the removal lasted at least until the winter of 2005.

According to the Indictment, beginning in or about February 2002,

Defendant Lippold was the main person in charge of supervising the removal of the industrial waste and disposing of the boron ash wastewater at the Curry facility. Indictment, ¶ 12.

The Indictment further alleges that, in or before the spring of 2002, Defendants Curry Ready Mix, Curry Ice & Coal, and Lippold & Arnett were notified by the IEPA that a valid NPDES permit was required to discharge the boron ash wastewater into the Sangamon tributary. In order to obtain an NPDES permit to discharge the boron ash wastewater, Defendant Curry Ice & Coal filed an application for the permit approximately in March 2002. According to the Indictment, by at least March of 2002, Lippold knew that, without an NPDES permit issued by the IEPA, boron ash wastewater could not be discharged into the Sangamon tributary.

The Indictment alleges that shortly after Defendant Curry Ice & Coal's submission of the NPDES application, specifically in or about May or June 2002, the IEPA notified Defendants Curry Ready Mix, Curry Ice & Coal, and Lippold & Arnett that the NPDES application would be denied. Upon this notification, Defendant Curry Ice & Coal withdrew its application for the NPDES permit in or about June 2002. Also in or about June 2002, Defendant Curry Ice & Coal, through counsel, sent a letter to

the IEPA requesting a "provisional variance," a special permission to discharge the boron ash wastewater to the Sangamon tributary even though such discharge would exceed the IEPA water quality standards. At the end of July 2002, Defendant Curry Ice & Coal subsequently withdrew that request and re-submitted an amended request for a provisional variance sometime in early August 2002.

The Indictment alleges that the IEPA denied the amended request for a provisional variance in or about the end of August 2002. According to the Indictment, in or about February 2003, Defendant Lippold and other employees of Defendants Curry Ready Mix and Curry Ice & Coal met with the IEPA officials, at which time the officials informed the Defendants that "analytical monitoring was necessary to determine if the industrial waste in the excavation at the Curry facility had also contaminated the area groundwater and drinking wells." Indictment, ¶ 19.

According to the Indictment, the Curry facility had two dirt and gravel parking lots. The lower-level parking lot, which was located specifically East of the excavation site, sloped toward the Sangamon tributary and the excavation site. The upper-level parking lot, which was located on the opposite side of the Sangamon tributary at the Curry facility, similarly

sloped toward the Sangamon tributary. The Defendants used these parking lots to park the trucks used in operating their business.

The Indictment alleges that, in or about March or April 2003, the IEPA permitted the Defendants to spread the boron ash wastewater on the Curry facility's lower and upper-level parking lots in order to control dust. The IEPA, however, cautioned and warned the Defendants that there was to be no run-off from the parking lots into the Sangamon tributary. The Indictment states that in or before April of 2003, at the direction of Defendant Lippold, a drainage ditch that would collect water run-off from the lower parking lot's surface was dug between the excavation and the lower-level parking lot. The Indictment alleges that around the same time period, Defendant Lippold directed the installation of a discharge pipe at the bottom of the drainage ditch. The Indictment states that "[t]he discharge pipe was buried under a berm and ran from the bottom of the drainage ditch to the other side of the berm where it emptied onto a slope approximately 15 yards uphill from the Sangamon tributary." Indictment, ¶ 22.

According to the Indictment, beginning in or about March or April 2003 and continuing until approximately the beginning of June 2003,

Defendant Lippold directed the installation of pumps and hoses at the Curry facility excavation. The Indictment alleges that these pumps and hoses were used to pump the boron ash wastewater from the excavation into tanker trucks. At the direction of Defendant Lippold, the boron ash wastewater in the tanker trucks was spread on the lower and upper-level parking lots at the Curry facility. The Indictment alleges that, in the process of doing this, the run-off occasionally flowed into the Sangamon tributary because "the volume of boron ash wastewater applied exceeded the ability of the parking lots to absorb it." Indictment, ¶ 24.

The Indictment alleges that, beginning in or about March or April 2003 and continuing until approximately the beginning of June 2003, Defendant Lippold ordered the boron ash wastewater to be pumped out of the excavation 24 hours a day. The Indictment alleges that the boron ash wastewater could not be spread on the parking lots at night because of the trucks were then parked in the lots. The Indictment alleges that during the same time period, the tanker trucks containing the boron ash wastewater were sometimes allowed to overflow. This caused the boron ash wastewater to enter the drainage ditch, flow into the discharge pipe and discharge onto a slope and then ultimately flow into the Sangamon tributary. According

9

to the Indictment, on some occasions, Defendant Lippold also directed "that a hose from the excavation containing the boron ash wastewater discharge directly to slope adjacent to the Sangamon tributary", causing the boron ash wastewater to enter the Sangamon tributary from the slope.  Indictment, ¶ 28.

The Indictment alleges that, by engaging in the above acts, Defendants Curry Ready Mix, Curry Ice & Coal, Lippold & Arnett, and Lippold caused the discharge of substantial amounts of boron ash wastewater to flow into the Sangamon tributary by in or about the early part of June of 2003.

## ANALYSIS

The Government seeks to introduce evidence under the "intricately related" doctrine that the ash waste was buried at the Curry excavation site on North Dirksen Parkway and remained there both before and during the time period of the Indictment, and that Defendant Lippold failed to properly remove all of the ash waste, as directed by the IEPA beginning in June of 2001, "because he caused some of it to be buried at [the excavation] site . . . .³  Government Response to Defendant's First Motion In Limine

---

³The Court notes that the Government appears to suggest in its brief that Lippold was the person who had ordered the ash waste to be buried at the Curry excavation site. However, there is nothing in the Indictment that alleges that Lippold directed the ash

(d/e 40), at 2. The Government contends that this evidence is "intricately related" to the offense charged in this case, the criminal offense of knowingly discharging a pollutant into navigable waters of the United States from a point source without a valid NPDES permit, in violation of 33 U.S.C. §§ 1311(a) and 1319(c)(2)(A), and in violation of 18 U.S.C. § 2.

Defendant objects and argues that such evidence does not qualify as "intricately related" evidence and that admitting such evidence violates Federal Rule of Evidence 404(b) which provides in part that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith."[4]  Fed. R. Evid.

---

waste to be buried in the excavation at the Curry facility. The Indictment specifically alleges that Defendants Curry Ready Mix, Curry Ice & Coal and Lippold & Arnett accepted the industrial waste from CWLP and used such waste to fill the Curry facility excavation site. Indictment, ¶ 9. With respect to Defendant Lippold's involvement, the Indictment alleges that, from about 1999, Defendant Lippold agreed to provide consulting services to Defendant Curry Ready Mix, and that, from 1999 to at least the summer of 2003, Defendant Lippold "exercised substantial authority over the Curry facility operations." Id. at ¶ 2. With respect to Lippold's control over the removal of the ash waste, the Indictment alleges as follows: "Beginning in or about February 2002, defendant Lippold, acting as an agent for defendants Curry Ready Mix, Curry Ice & Coal and Lippold & Arnett, Inc., was the primary person responsible for supervising the removal of the industrial waste and disposing of the boron ash wastewater at the Curry facility." Id. at ¶ 12.

[4]The Court notes that Defendant Lippold appears to suggest the fact that the Indictment in this case does not allege that "the ash was discharged or that the failure to remove the ash is any way a violation of the Clean Water Act" somehow makes the intricately related doctrine inapplicable to the instant case. Defendant Lippold's First Motion In Limine at 5. Defendant's assertion is without merit because, as noted supra, the intricately related doctrine specifically applies to uncharged acts of the Defendant.

11

404(b).

The Seventh Circuit has repeatedly recognized that evidence of uncharged acts is admissible at trial if the contested evidence is intricately related or inextricably intertwined to the acts charged in the Indictment. United States v. Gibson, 170 F.3d 673, 680 (7th Cir. 1999) (quoting United States v. Spaeni, 60 F.3d 313, 316 (7th Cir. 1995)); see also United States v. King, 126 F.3d 987, 995 (7th Cir. 1997). In order to determine the admissibility of the contested evidence which is not subject to the limitations imposed by Rule 404(b), courts must ask: "[(1)] whether the evidence is properly admitted to provide the jury with a complete story of the crime [on] trial, [(2)] whether its absence would create a chronological or conceptual void in the story of the crime, or [(3)] whether it is so blended or connected that it incidentally involves, explains the circumstances surrounding, or tends to prove any element of, the charged crime." United States v. Chavis, 429 F.3d 662, 670 (7th Cir. 2005) (quoting United States v. Ramirez, 45 F.3d 1096, 1102 (7th Cir. 1995)) (internal quotations omitted).[5] Evidence that satisfies any one of the above requirements may

---

[5] Relying on Chavis, Defendant appears to erroneously suggest that, in order to allow evidence under the intricately related doctrine, the evidence sought must be similar to the offense charged. In that effort, Defendant Lippold states: "In *Chevis* [sic], the

be admitted pursuant to the "intricately related" doctrine, provided that the evidence in question also satisfies the requirements set forth in Federal Rule of Evidence 403, which provides that even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed R. Evid. 403; see Chavis, 429 F.3d at 670; Gibson, 170 F.3d at 680.

In this case, the evidence that the Government intends to introduce appears to complete the story of the charged offense, provides a chronology of the events that led to the instant Indictment, and is so blended or

---

evidence consisted of illegal conduct identical to the conduct for which the defendant is charged. To parallel the factual similarity presented in *Chevis* in this case, the Government would necessarily have to offer proof of other illegal discharges. The alleged failure to remove ash and the illegal discharges alleged in the indictment are qualitatively different." Defendant Lippold's First Motion In Limine, at 6. Defendant Lippold is mistaken. The Seventh Circuit has never held that intricately related evidence must be identical to the charged offense. United States v. Bogan, 267 F.3d 614, 622 (7th Cir. 2001). Indeed, the Seventh Circuit has allowed evidence under the intricately related doctrine even though the evidence was not identical to the offense charged. For example, in Bogan, the Seventh Circuit held that evidence of a correction officer's seizure of contraband in the defendant's cell was intricately related to the offense charged, the offense of using a deadly weapon to assault a corrections officer, and assaulting a corrections officer with the intent to commit murder. Id. Moreover, in United States v. Menzer, the Seventh Circuit determined that evidence of the defendant's prior sexual exploitation conviction was intricately related to the prosecution of an arson case because it was probative of the defendant's motive and intent. Menzer, 29 F.3d 1223, 1233 (7th Cir. 1994)).

connected that it incidentally involves, explains the circumstances, and tends to prove an element of the substantive offense. First, the contested evidence completes the story of the alleged crime. The evidence of ash waste remaining in the large excavation at the Curry facility, the IEPA directing the Defendants to remove such waste beginning in June 2001, and Defendant Lippold (who was allegedly the primary person in charge of supervising the removal of the industrial waste at the Curry facility beginning in February 2002) failing to properly remove the ash waste, all serve to explain the events leading up to the alleged discharges in question, and provide the jury with a context for the allegations. The contested evidence will enable the jury to fully understand the extent of authority Lippold exercised over the ash waste buried in the excavation at the Curry facility, as well as his authority over the Curry facility employees, both at the time when the ash waste was buried and at the time when Lippold allegedly ordered the employees at the Curry facility to remove and dispose of such waste in violation of the IEPA's directives. The contested evidence, thus, completes the story of the alleged crime.

     Defendant Lippold, however, contends that the Government could simply inform the jury that the ash waste was buried at the excavation site,

leaving out the fact that Defendant Lippold failed to comply with the IEPA's orders directing the Defendants to properly remove the ash waste. Defendant similarly contends that the Government could simply inform the jury that water that had accumulated in the excavation site contained boron from the ash, without introducing evidence that the ash remained in the excavation site in violation of the IEPA's orders.

Admitting the evidence in question, however, will give a more accurate picture of the circumstances surrounding the crime and the events leading up to the charged offense. Indeed, had the ash waste been properly removed in accordance with the IEPA's order, rather than being buried in the excavation site, the water in the excavation site would not have been contaminated with an allegedly elevated boron level in the boron ash wastewater.

The absence of such evidence would also leave a chronological void in the story of the alleged crime--that is, without this evidence, the jury will not be able to know the events that led to the alleged illegal discharges, and the extent of Lippold's involvement in the unpermitted discharges. The ash waste was buried in the excavation site at the Curry facility sometime in 1999, at which time, Defendant Lippold began to exercise substantial

authority over the Curry facility operations pursuant to a purchase agreement between Defendant Curry Ready Mix and Defendant Lippold. Beginning in February 2002, Defendant Lippold allegedly became the primary person in charge of supervising the removal of the ash waste at the Curry facility. The alleged discharges occurred in 2003.

The absence of the contested evidence would leave a two-year gap in the story, including Defendant Lippold's extent of alleged involvement in the crime. Without this evidence, the jury will not be provided with the full and complete story. The absence of such evidence could lead the jury to think that the IEPA had permitted the Defendants to have the ash waste remain in the excavation site--when, in fact, the IEPA had directed the Defendants to properly remove and dispose of the waste beginning in 2001. Moreover, without this evidence, the jury could think that Defendant Lippold had no involvement in the unpermitted discharges--when, in fact, Defendant Lippold allegedly exercised substantial authority over the Curry facility operations beginning in 1999 and was the main person responsible for supervising the proper removal of industrial waste and disposing of the boron ash wastewater at the Curry facility beginning in or about February 2002.

The contested evidence is also so connected and blended to the charged crime that it explains the circumstances surrounding the charged offense. As explained earlier, the evidence that the ash waste remained in the Curry facility, because Defendant Lippold failed to comply with the IEPA's order, and that this same waste caused a higher level of boron contamination in the rain water that had accumulated in the excavation site serves to explain to the jury the circumstances surrounding the charged activities.

Next, the contested evidence also tends to prove an element of the substantive offense. To impose criminal liability on Defendant Lippold, the Government must prove beyond a reasonable doubt that Lippold knowingly discharged a pollutant into waters of the United States from a point source without a valid NPDES permit. The contested evidence tends to prove the first element: Defendant Lippold was involved in the alleged unpermitted discharges. Indeed, the contested evidence tends to show the extent of authority Lippold exercised over the removal of the waste in the Curry excavation site.

The evidence in question also satisfies the requirements of Rule 403. Defendant Lippold argues that allowing the ash waste evidence would be

unfairly prejudicial to him. Defendant Lippold argues that "such evidence would lead the jury to infer that Lippold may be responsible somehow for the illegal discharges by virtue of the fact that he allegedly did not remove the ash [as ordered by the IEPA]. The possibility of an improper inference being drawn vastly outweighs the value to the Government of evidence of failure to remove the ash." Defendant Lippold's First Motion In Limine, at 5.

The Seventh Circuit has explained that "Rule 403 was never intended to exclude relevant evidence simply because it is detrimental to one party's case; rather, the relevant inquiry is whether any *unfair prejudice* from the evidence substantially outweighs its probative value. Evidence is *unfairly* prejudicial only if it will induce the jury to decide the case on an improper basis, commonly an emotional one, rather than on the evidence presented." Bogan, 267 F.3d at 622-623 (quoting United States v. Denberg, 212 F.3d 987, 994 (7th Cir. 2000)) (internal quotations and citation omitted).

In the present case, the evidence in question is not *unfairly* prejudicial to Defendant Lippold and is highly probative of the extent of authority Defendant Lippold exercised over the removal and management of the ash waste at the Curry facility, both at the time when the ash waste was buried

in the excavation and at the time when the alleged discharges occurred in 2003. The ash evidence would not be admitted for the improper purpose of showing Defendant Lippold's bad character or tendency to violate IEPA's order. Rather, the ash evidence would be admitted for the limited purpose of explaining to the jury the extent of involvement and authority that Lippold exercised with respect to the excavation site and the alleged discharges in question that led to the instant Indictment. Moreover, any prejudicial effect the contested evidence may have could be mitigated by limiting jury instructions. The probative value of the ash evidence is not substantially outweighed by any risk of unfair prejudice.

THEREFORE, for the reasons set forth above, Defendant Lippold's First Motion In Limine (d/e 35) is DENIED, and his Amended Motion to Require Notice of 404(b) Evidence (d/e 25) is ALLOWED, even though at this juncture the Government has stated it has no Rule 404(b) evidence.

IT IS THEREFORE SO ORDERED.

ENTER: July 11, 2006.

    FOR THE COURT:

                s/ Jeanne E. Scott
                JEANNE E. SCOTT
                UNITED STATES DISTRICT JUDGE